IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 07-00211-01-CR-W-SOW |
| ) | |
| WILLIAM CHARLES BROWN, Jr., ) | |
| ) | |
| Defendant. ) | |

REPORT AND RECOMMENDATION

This matter is currently before the Court on defendant Brown's Motion to Suppress Evidence (doc #17). For the reasons set forth below, it is recommended that this motion be denied.

I. INTRODUCTION

On June 20, 2007, the Grand Jury returned a one count indictment against defendant William Charles Brown, Jr. The indictment charges that on June 6, 2007, defendant Brown, having been convicted of crimes punishable by imprisonment for terms exceeding one year, knowingly possessed a firearm.

On October 12, 2007, an evidentiary hearing was held on defendant's motion to suppress. Defendant Brown was represented by Assistant Federal Public Defender Ronna Holloman-Hughes. The Government was represented by Assistant United States Attorney Jess Michaelsen. The Government called Officer Eian Bussell, Officer Joe Rooney, Detective Gary Knapp, Detective Doug Roberts, Sergeant Rod Gentry and Detective Darrell Reach of the Kansas City, Missouri Police Department as witnesses. The defense called Tiffany Strawn to testify.

II. FINDINGS OF FACT

On the basis of the evidence adduced at the evidentiary hearing, the undersigned submits the following proposed findings of fact:

1. On June 6, 2007, at approximately 12:30 p.m., Detective Gary Knapp, Detective Rod Gentry and Detective Doug Roberts were in a gun shop called Denny's Guns in North Kansas City, Missouri. (Tr. at 15-16) Detective Gentry was being promoted to sergeant. (Tr. at 16, 28-29) Detective Gentry would be going back to the field on

patrol and he would be carrying a rifle. (Tr. at 16) Detective Gentry had bought a patrol rifle and needed to get some items for it because he had to go to patrol rifle training. (Tr. at 15-16) The detectives were in plain clothes. (Tr. at 16) Detective Knapp described the gun shop as a small store with an L-shaped counter. (Tr. at 16) When the detectives arrived, there were no other customers in the shop. (Tr. at 16-17) One clerk was helping the detectives. (Tr. at 17) The people that worked at the gun shop knew that Detective Gentry was a Kansas City, Missouri police officer. (Tr. at 17) Individuals entering the shop would not have known that the detectives were police officers. (Tr. at 17)

2. Detective Knapp and Detective Roberts saw a male (later identified as defendant Brown) enter the shop with a female and a small child. (Tr. at 17, 29) Brown was wearing a large shirt or jersey and some long, baggy shorts. (Tr. at 18) Brown went to the counter and asked a clerk for either a magazine or a clip for a Tec 9. (Tr. at 17-18) Detective Roberts testified that he could hear what was being said because it is a very small store. (Tr. at 29) Detective Knapp testified that a "Tec 9," an Intertec .9mm, is a small weapon that is usually semi-automatic with a short barrel, usually a long magazine, possibly 30 rounds, and a pistol grip handle. (Tr. at 18) The clerk handed Brown a magazine from behind the counter. (Tr. at 18) Brown took the magazine and said he wanted to make sure it would fit. (Tr. at 18-19) Brown then lifted his shirt, reached into his right front pants pocket and pulled out a Tec 9. (Tr. at 19) The clerk asked Brown if the gun was loaded. (Tr. at 19) Brown said it was unloaded. (Tr. at 19) Brown tried the magazine in the gun and said it did not fit. (Tr. at 19) Brown handed the magazine back to the clerk. (Tr. at 19) The clerk said that they did not have any other magazines for a Tec 9 right now. (Tr. at 19) Brown put the gun back in his pocket with his shirt over it and left the shop. (Tr. at 19) The detectives did not see Brown show the clerk a driver's license. (Tr. at 19, 31, 44)

3. The detectives were concerned because it did not appear to them that defendant Brown was old enough to have a permit to carry a concealed weapon. (Tr. at 19) Detective Roberts testified that an individual must be at least 23 years of age[1] to obtain a permit to carry a concealed weapon. (Tr. at 37) When defendant Brown left the shop with the weapon, there was a short conversation amongst the detectives and the clerks in the store about how young Brown looked. (Tr. at 31, 44) Detective Knapp testified that Brown did not look like he was even 21. (Tr. at 19, 24) Detective Roberts testified that would have guessed Brown's age to have been around 20 or 21. (Tr. at 31) Sergeant Gentry testified that his impression was that Brown was probably in his late teens or maybe 20. (Tr. at 43-44) Detective Knapp and Sergeant Gentry further testified that it was unusual to see someone carrying an Intertec 9 in their pants pocket. (Tr. at 19, 43) Detective Knapp testified that the detectives did not attempt to stop Brown in the gun shop to check him for a permit because while Detective Knapp was armed, his partners, Detective Gentry and Detective Roberts were not armed. (Tr. at 16, 23) Further, the detectives were not wearing body armor. (Tr. at 23) Finally, Detective Knapp knew the clerks in the gun shop were armed and he did not want the situation to escalate into a possible shootout inside the shop. (Tr. at 23-24)

4. The following dialogue between defense counsel and Sergeant Gentry sets forth the

---

[1] See Mo. Rev. Stat. § 571.101.2(1).

2

detectives' concerns and basis for further investigation:

> Q. Okay. And it's not illegal to carry a Tec 9 with a permit, is that correct?
>
> A. No, as long as you got one.
>
> Q. Okay. And at the time you were in the store and saw Mr. Brown, you had no idea whether or not he had a permit?
>
> A. Correct.
>
> Q. You guessed at his age. You had no idea what his age was, is that correct?
>
> A. That's correct.
>
> Q. And you had no idea that he was a felon at the time, is that correct?
>
> A. No, but that being said, I mean, any time that you see a weapon of that magnitude being transported like that, it, and heading out into the general public with it concealed in your right front pocket does warrant at least investigating the stuff that you're telling me, the age, the permit and so on and so forth. And that's exactly what we did.
>
> Q. But did you know at the time whether or not he was a felon, at the time he was in the store?
>
> A. No, that didn't come to light. I think once we ascertained his real identity when he got done giving us some false information, we were able to ascertain that. But again, we were just doing our job as far as investigating it. And again, ma'am, had he had a permit, had he not been a felon, had he given us the right name, then obviously we wouldn't be here today. So, we were just trying to do a good thorough investigation.

(Tr. at 48-49)

5. The detectives observed defendant Brown, the female and the child walk over to a vehicle parked in the parking lot. (Tr. at 20) They were behind the vehicle for a period of time and then got inside the vehicle. (Tr. at 20-21) The detectives followed the vehicle. (Tr. at 21)

6. The vehicle the detectives were driving was an undercover vehicle that they were using in an investigation. (Tr. at 21) It was not equipped with emergency equipment. (Tr. at 21) Detective Roberts called in on a police radio to try to alert a patrol division or anyone monitoring the air to have the vehicle checked. (Tr. at 21, 26, 31-32) Detective Roberts informed dispatch that there was a possible party armed. (Tr. at 32)

7. Officer Eian Bussell heard the radio call come over the air that undercover detectives needed a vehicle stopped in regard to a party armed in the vehicle. (Tr. at 3, 8) The detectives described the vehicle and location. (Tr. at 3) Officer Bussell observed the vehicle and activated the lights and sirens on his motorcycle. (Tr. at 3-4) The vehicle pulled immediately to the shoulder just after the on-ramp for southbound I-35

from Front Street. (Tr. at 4) Initially, Officer Bussell was all by himself; there were no other officers to assist him. (Tr. at 4) The undercover detectives drove by the stopped vehicle and pulled off the road approximately 100 to 200 yards from where the car stop took place. (Tr. at 4, 21) Detective Roberts testified that the detectives drove on by because they were all assigned to an undercover unit and they did not want to compromise the undercover vehicle. (Tr. at 33, 45) Further, if there would have been a gun battle, the detectives did not want to be in any type of cross-fire. (Tr. at 33)

8. Officer Tony White and Sergeant Mark Hatcher arrived to assist Officer Bussell before he had the occupants exit the vehicle. (Tr. at 4-5) The officers conducted a felony car stop. (Tr. at 5) Generally, in a felony car stop, one or two officers will have their pistols drawn. (Tr. at 5) One officer will give verbal commands for the parties to exit the vehicle. (Tr. at 5) One will be a cover officer and another officer will apply the handcuffs until all the parties are secure and the vehicle is cleared so that the officers know that there is no other threat inside the vehicle. (Tr. at 5) Officer Joe Rooney also arrived to assist. (Tr. at 9-10) Officer Rooney stopped back from the scene and held the traffic for the officers while they conducted the car stop. (Tr. at 10)

9. There were four adults and one child inside the vehicle. (Tr. at 5) After all the adult parties in the vehicle were secured (that is out of the vehicle, patted down and handcuffed), Detective Knapp and Detective Roberts came back to the vehicle. (Tr. at 5-6, 21-22) Sergeant Gentry remained in the undercover vehicle because he was involved in an undercover operation and did not want to be standing on the side of the road next to a marked car and officers in uniform. (Tr. at 45-46) Detective Knapp testified that when he went back to the vehicle that had been stopped, he saw the individual that he had seen with the gun in the gun shop. (Tr. at 22) Detective Knapp then turned his attention to the baby who was crying in the vehicle. (Tr. at 22)

10. Officer Rooney also proceeded up to the location of the vehicle and assisted in identifying the occupants of the vehicle. (Tr. at 10) Officer Rooney testified that there was some discrepancy at the time as to defendant Brown's identity. (Tr. at 11) Brown apparently did not have any identification. (Tr. at 12) Detective Roberts testified that the other passengers were very reluctant to say who he was. (Tr. at 34) Officer Rooney asked the other gentleman in the vehicle, "Hey, who is this guy that's with you. Let's try to work through this." (Tr. at 11) The gentleman advised Officer Rooney that he only knew him as Pacman. (Tr. at 11) Another officer had already pulled up some information in regards to the name that Brown gave at the scene. (Tr. at 11) Brown said that his name was Rakin Brown and gave his date of birth as January 23, 1989. (Tr. at 12, 34) The information did not match the description of someone who Officer Rooney knew as Pacman. (Tr. at 11) Officer Rooney testified that when he worked East Patrol Division, he knew there was a person named William Brown who went by Pacman who lived in that area. (Tr. at 11) The officers pulled up a picture of William Brown and determined that the person in their custody was William Brown. (Tr. at 11) Officer Rooney was walking Brown back to the wagon when he asked Brown, "Partner, why are you lying about who you are?" (Tr. at 11) Officer Rooney testified that he told Brown that they were going to find out who he was when they took his fingerprints and that it would be easier on him if he just came clean about who he was. (Tr. at 11-12) Brown told Officer Rooney, "I just want to see my kids. It's about my kids." (Tr.

4

at 12) Officer Rooney said, "So, you're William Brown, correct?" (Tr. at 12) Brown replied that he was William Brown. (Tr. at 12)

11. The officers had run a license plate check on the vehicle and dispatch had informed the officers as to the registered owner of the vehicle. (Tr. at 35) Detective Roberts testified that he believed Sergeant Hatcher asked the registered owner/driver of the vehicle for consent to search the vehicle for a gun. (Tr. at 34, 36, 38) Detective Roberts testified that he overheard the individual tell Sergeant Hatcher that if there was a gun in there, then the officers needed to get it out because she did not need that kind of problem and that she had a baby. (Tr. at 35) Detective Roberts testified that the owner/driver of the vehicle gave Sergeant Hatcher her keys. (Tr. at 38)

12. Detective Knapp searched the vehicle for the weapon. (Tr. at 23) Detective Knapp testified that the officers knew there was a weapon somewhere in the vehicle because the officers had kept the vehicle in sight while they were following it and the weapon had not been thrown out. (Tr. at 23) For everyone's safety, the officers wanted to find the weapon. (Tr. at 23) The weapon was ultimately recovered from the trunk. (Tr. at 23) Detective Roberts testified that Sergeant Hatcher had the keys, opened up the trunk, pulled the weapon out and handed it to Detective Roberts. (Tr. at 23, 35) Detective Roberts took the weapon up to the undercover vehicle so that Sergeant Gentry could keep an eye on it. (Tr. at 35, 46)

13. Tiffany Strawn testified that on June 6, 2007, at about 1:00 p.m., she was heading home on I-29 with her boyfriend, Willie, his girl and his baby when they were stopped by police. (Tr. at 53-54) The occupants of the vehicle were told to exit the vehicle one by one, back up and kneel on the ground. (Tr. at 55) They were placed in handcuffs. (Tr. at 56) Ms. Strawn testified that the vehicle belonged to her, but her boyfriend was driving. (Tr. at 63) Ms. Strawn testified that she was never asked for consent to search the vehicle nor did she give her consent. (Tr. at 56) Ms. Strawn testified that no one else was asked for consent to search the vehicle. (Tr. at 57) Ms. Strawn further testified that the officers did not tell her what they were searching for in the vehicle. (Tr. at 56) According to Ms. Strawn, an officer did ask her which key gets into the trunk, but he did not ask if he could search in the trunk. (Tr. at 56)

14. Defendant Brown signed a Miranda Waiver (Government's Ex. 2) and provided a hand-written statement (Government's Ex. 3). (Tr. at 51)

### III. DISCUSSION

Defendant Brown seeks to suppress all evidence and testimony relating to such evidence obtained as a result of the stop and search of the vehicle in which defendant was a passenger on June 6, 2007. (Motion to Suppress Evidence at 1) In support of his motion, defendant argues that both the initial vehicle stop and the subsequent search of the trunk were unreasonable. (Id. at 2-4) Defendant also argues that any statements he made at the scene of his arrest and later that day in custody must also be suppressed as fruit of the poisonous tree. (Id. at 4)

5

A.   The Vehicle Stop

Both investigative stops and arrests are seizures. However, an investigative stop need only be supported by a reasonable, articulable suspicion that criminal activity may be afoot, whereas an arrest must be supported by probable cause. See Terry v. Ohio, 392 U.S. 1, 25-31 (1968); United States v. Walker, 494 F.3d 688, 691 (8th Cir. 2007); United States v. Raino, 980 F.2d 1148, 1149 (8th Cir. 1992), cert. denied, 507 U.S. 1011 (1993); United States v. Miller, 974 F.2d 953, 956 (8th Cir. 1992); United States v. Jones, 759 F.2d 633, 636 (8th Cir.), cert. denied, 474 U.S. 837 (1985). Reasonable suspicion entails some minimal level of objective justification for making a stop–that is, something more than a hunch. See United States v. Sokolow, 490 U.S. 1, 7 (1989); United States v. Fuse, 391 F.3d 924, 929 (8th Cir. 2004), cert. denied, 544 U.S. 990 (2005); United States v. Delaney, 52 F.3d 182, 187 (8th Cir.), cert. denied, 516 U.S. 878 (1995). "A dual inquiry determines the reasonableness of an investigative stop: 'whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place.'" United States v. Doffin, 791 F.2d 118, 120 (8th Cir.), cert. denied, 479 U.S. 861 (1986)(quoting Terry, 392 U.S. at 19-20).

The record in this case establishes that three undercover detectives with the Kansas City, Missouri Police Department observed an individual who they each believed to be too young to obtain a permit to carry a concealed weapon withdraw a weapon from his pants pocket at a gun shop and then again conceal the weapon in his pocket. (See Fact Nos. 2 and 3, supra) It is a violation of Missouri law to carry a concealed firearm without a valid license. See Mo. Rev. Stat. §§ 571.030 and 571.101. The detectives saw the individual get into a vehicle and they followed the vehicle. (See Fact No. 5, supra) The detectives knew the weapon had to be somewhere in the vehicle because the detectives had kept the vehicle in sight while they were following it and the weapon had not been thrown out. (See Fact No. 12, supra) Based on the facts known to the officers at the time the officers stopped the vehicle, the Court concludes that the officers had a reasonable, articulable suspicion that defendant Brown was engaged in criminal activity and that the officers were justified

6

in conducting an investigative stop. The officers were not acting on a mere hunch. Thus, the first part of the Terry inquiry shows that the investigative stop was justified under the circumstances.

As to the second part of the Terry inquiry, "officers may take such additional steps as are 'reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop.'" United States v. Doffin, 791 F.2d 118, 120 (8th Cir.), cert. denied, 479 U.S. 861 (1986)(quoting United States v. Hensley, 469 U.S. 221, 235 (1985)). A police officer may conduct a pat-down search of the suspect during an investigative stop if the officer has reason to believe that such person might be armed and dangerous. See Terry v. Ohio, 392 U.S. 1, 30 (1968). Officers must employ the least intrusive means of detention reasonably necessary to achieve the purpose of the stop. See Florida v. Royer, 460 U.S. 491, 500 (1983). However, "the use of handcuffs [does not] exceed the bounds of a Terry stop, so long as the circumstances warrant that precaution." Houston v. Clark County Sheriff Deputy John Does 1-5, 174 F.3d 809, 815 (6th Cir. 1999).

Given that the officers knew there was a weapon in the vehicle, the officers had a credible concern for officer safety. The officers' actions in bringing each person out of the vehicle and handcuffing them were reasonably necessary to protect the officers' personal safety and to maintain the status quo so that the officers could determine whether the occupants of the vehicle had engaged in criminal activity. No constitutional violation took place in the initial vehicle stop.

B.   The Search of the Trunk

There is a factual dispute regarding whether consent was given to justify the search of the trunk. Detective Roberts testified that he believed Sergeant Hatcher asked the registered owner of the vehicle for consent to search the vehicle for a gun. (See Fact No. 11, supra) Detective Roberts testified that he overheard the individual tell Sergeant Hatcher that if there was a gun in there, then the officers needed to get it out. (Id.) Detective Roberts further testified that the owner of the vehicle gave Sergeant Hatcher her keys. (Id.) Sergeant Hatcher did not testify. Tiffany Strawn testified that the vehicle belonged to her, that neither she nor anyone else gave the officers consent

to search the vehicle and that the officers did not tell her what they were searching for in the vehicle. (See Fact No. 13, supra)

The Court finds that it need not resolve the factual dispute because the search was otherwise justified. An "automobile exception" to the Fourth Amendment allows police officers who have legitimately stopped an automobile and who have probable cause to believe that contraband is concealed within it to conduct a warrantless search of the vehicle that is as thorough as searches authorized by warrant. See United States v. Ross, 456 U.S. 798, 823-25 (1982). The probable cause determination must be based on objective facts that could justify the issuance of a warrant. Id. at 808. As set forth above, the record in this case establishes that three undercover detectives with the Kansas City, Missouri Police Department observed an individual who they each believed to be too young to obtain a permit to carry a concealed weapon withdraw a weapon from his pants pocket at a gun shop and then again conceal the weapon in his pocket. (See Fact Nos. 2 and 3, supra) The detectives saw the individual get into a vehicle and they followed the vehicle. (See Fact No. 5, supra) The vehicle was stopped and officers had "patted down" the occupants of the vehicle. (See Fact No. 9, supra) The detectives knew the weapon had to be somewhere in the vehicle because the detectives had kept the vehicle in sight while they were following it and the weapon had not been thrown out. (See Fact No. 12, supra) In addition to knowing that there was an unaccounted for weapon, the officers believed that the person who had previously had the weapon in his pocket was lying about his identity[2] and the other occupants of the vehicle were reluctant to say who he was. (See Fact No. 10, supra) Based on these facts, the officers had probable cause to believe that the automobile contained contraband or other evidence of a crime. These facts would have provided the probable cause needed to obtain a search warrant. Therefore, under the "automobile exception," the search of the vehicle, including the trunk, was proper. See United States v. Olivera-Mendez, 484

---

[2]Even if the officers had believed what defendant Brown was telling them, he would have been violating the law in carrying a concealed weapon. Brown stated that his date of birth was January 23, 1989, making him only 18 years of age, and too young to obtain a permit to carry a concealed weapon. (See Fact No. 10, supra)

Case 4:07-cr-00211-SOW   Document 27   Filed 11/07/07   Page 8 of 9

F.3d 505, 512 (8th Cir. 2007)(quoting Ross, 456 U.S. at 825)("If probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search.")  Again, no constitutional violation took place.

      C.      Defendant's Statements

Defendant's final argument, that statements made at the scene of his arrest and later that day in custody must be suppressed under the exclusionary rule as fruit of the poisonous tree, also fails. As set forth above, contrary to defendant's argument, the officers did not violate defendant's constitutional rights in conducting the investigative stop or in searching the vehicle.  Therefore, any statements made by defendant could not be considered fruit of the poisonous tree.

## IV.  CONCLUSION

Based on the foregoing, it is

RECOMMENDED that the Court, after making an independent review of the record and applicable law, enter an order denying defendant Brown's Motion to Suppress Evidence (doc #17).

Counsel are reminded they have ten days from the date of receipt of a copy of this Report and Recommendation within which to file and serve objections to same.  A failure to file and serve objections by this date shall bar an attack on appeal of the factual findings in this Report and Recommendation which are accepted or adopted by the district judge, except on the grounds of plain error or manifest injustice.

                                                      */s/ Sarah W. Hays*
                                                          SARAH W. HAYS
                                        UNITED STATES MAGISTRATE JUDGE